**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CRIMINAL ACTION** |
| ) | |
| v. ) | No. 05-530-MLB |
| ) | |
| JAMES DANIEL LINDSAY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This case comes before the court on defendant's motion to suppress evidence seized upon his arrest and his subsequent statement to officers. The court held a hearing on the matter in Las Cruces, New Mexico, on July 15, 2005. For the reasons herein, defendant's motion is granted.[1]

### I.  FACTS

At approximately 10:45 a.m. on November 3, 2004, in Deming, New Mexico, Teresa Montellano observed an Hispanic male in his early 20's wearing blue jeans and a grey denim jacket with denim sleeves trying to get a wallet out of a co-worker's car. The man was on foot, walking down an alley. No bicycle was visible. Montellano, who is Hispanic and a thoroughly credible witness, called 911 and gave the man's description to the person answering the call. The dispatch log, received without objection, reflects the following information regarding Ms. Montellano's call: "Subj

---

[1]Defendant affirmatively stated at the hearing that he was not raising separately the matter of his statement. Because the court is suppressing defendant's arrest, his post-arrest statement is also suppressed.



HM grey sweatshirt, jeans, looking into vehicles."

Based on the call, central dispatch alerted all officers by radio of a car burglary in progress. A tape of the dispatch call apparently is available but it was not offered in evidence.[2] According to officers Sergeant Schindler and Lieutenant Gigante, who testified at the hearing, the officers were advised that the burglary was occurring at 8th and Birch Streets and that the suspect was seen walking in an alleyway. They testified that the suspect was described as a 5'9" male wearing a grey sweatshirt and blue pants.

Sergeant Schindler and Lieutenant Gigante started patrolling the area in separate cars looking for the suspect. The area is a few blocks from the location of the suspected burglary. There is no evidence that the area was considered of the "high crime" variety. However, there had been a number of car break-ins in the area in recent weeks.

About fifteen minutes after receiving the call, both officers saw defendant on a bicycle. He was not riding in a suspicious manner, he was not hurrying or racing away, nor was he breaking any laws. Sergeant Schindler testified that she was "looking for the physical description of a five-nine male, wearing a grey sweatshirt and blue pants" and that the person she stopped "was a white male

_____

[2]In his response to the government's motion to reopen the hearing, defendant states: "A tape recording of the dispatcher's call made to officers indicates that she described a Hispanic male." The court has not considered this information as evidence in reaching its decision. However, as will become obvious, had the court granted the government's motion to reopen, such evidence would be adverse to the government and to the officers' credibility.

wearing a grey sweatshirt and blue pants, sir, on a bike."  In fact, however, defendant, very obviously a Caucasian male, was wearing black nylon pants with white stripes and an olive green windbreaker.

Sergeant Schindler got out of her car.  She was wearing a sidearm.  She displayed her badge and told defendant to stop.  He did.  Lieutenant Gigante also was present wearing an exposed sidearm.  Both Sergeant Schindler and Lieutenant Gigante told defendant that he fit the physical description of a suspect in a motor vehicle burglary.  Sergeant Schindler asked for defendant's identification.  Defendant responded that he did not have any identification with him.  Sergeant Schindler then asked defendant for his name and date of birth and then proceeded to pat him down to search for weapons, allegedly for "officer safety."  When asked why she believed she was in need of a safety check, Sergeant Schindler testified "it's just a practice that I use, sir, on the streets.  We do that for our safety and for theirs, too."  She did not identify any particularized concern that defendant was armed or posed any threat.  Sergeant Schindler felt an object in defendant's right front pocket.  Defendant stated that the object was cigarettes and Sergeant Schindler was satisfied with his answer.

Sergeant Schindler then proceeded to check defendant's identity through NCIC while Lieutenant Gigante spoke with defendant.  Sergeant Schindler explained that she ran an NCIC check because "it's just a normal practice that we conduct because he, he didn't have an ID or any type of license on him, sir, so I

-3-

needed to make sure that's who he said he was." No evidence was presented that persons riding bicycles in Deming, New Mexico, must have IDs or driver's licenses. Lieutenant Gigante told defendant that they were investigating a burglary to which defendant responded that he was coming from Rene Vardugo's house on 9th Street. Lieutenant Gigante knew that Rene Vardugo lived on 9th Street and testified that he had no reason to disbelieve defendant's answer.

The NCIC check took about 20 minutes. Defendant was not handcuffed but he was not told he was free to leave. Officer Schindler then arrested defendant after learning from NCIC that defendant had two outstanding warrants for his arrest. Upon searching defendant, the officers seized methamphetamines. Defendant was later interrogated at the police station and charged with possession with intent to distribute methamphetamine.

Both Lieutenant Gigante and Sergeant Schindler testified that they were not aware that the suspect was an Hispanic male. They stated that they were familiar with dispatch logs. When asked if she knew what the log entry "HM" means, Sergeant Schindler, who has been a Deming police officer since 1999 and whose duties include teaching fellow officers regarding arrests, testified that "I have no idea what that initial means, but it could possibly mean [Hispanic male], yes, sir." Lieutenant Gigante, who has been a Deming police officer for ten years, testified "I do not know what the H-M stands for."

II.  **Applicable Law**

The court is aware of the standards applicable to matters of

-4-

this nature.   In <u>United States v. Quintana-Garcia</u>, 343 F.3d 1266

(10th Cir. 2003), the court stated:

> "The Fourth Amendment prohibits 'unreasonable
> searches and seizures' by the Government, and its
> protections extend to brief investigatory stops of
> persons or vehicles that fall short of traditional
> arrest." <u>United States v. Arvizu</u>, 534 U.S. 266, 273, 122
> S. Ct. 744, 151 L. Ed. 2d 740 (2002) (citing <u>Terry v.
> Ohio</u>, 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed. 2d 889
> (1968), and <u>United States v. Cortez</u>, 449 U.S. 411, 417,
> 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). The
> requirements of the Fourth Amendment are satisfied in
> this context "if the officer's action is supported by
> reasonable suspicion to believe that criminal activity
> '"may be afoot."'" <u>Id.</u> (quoting <u>United States v. Sokolow</u>,
> 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)
> (quoting <u>Terry</u>, 392 U.S. at 30, 88 S. Ct. 1868)).
>
> The Supreme Court has emphasized that, in
> determining whether an investigatory stop is supported by
> reasonable suspicion, courts must "'look at the totality
> of the circumstances' of each case to see whether the
> detaining officer has a 'particularized and objective
> basis' for suspecting legal wrongdoing." <u>Id.</u> The
> evaluation is made from the perspective of the reasonable
> officer, not the reasonable person. Officers must be
> permitted "to draw on their own experience and
> specialized training to make inferences from and
> deductions about the cumulative information available to
> them that 'might well elude an untrained person.'" <u>Id.</u>
> (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 418, 101
> S. Ct. 690, 66 L. Ed. 2d 621 (1981)); <u>see also</u>
> <u>Gandara-Salinas</u>, 327 F.3d at 1130.

<u>Id.</u> at 1270.

The standards also were discussed in <u>United States v. Johnson</u>,

364 F.3d 1185 (10th Cir. 2004), described by the court as a "close

case":

> <u>Terry</u> sets up a two-prong test of the reasonableness
> of investigatory detentions and weapons searches. <u>See</u>
> <u>Gallegos v. City of Colorado Springs</u>, 114 F.3d 1024, 1028
> (10th Cir. 1997). First, we must decide whether the
> detention was "'justified at its inception.'" <u>Id.</u>
> (quoting <u>Terry</u>, 392 U.S. at 20, 88 S. Ct. 1868). The
> government "must be able to point to specific and
> articulable facts which, taken together with rational
> inferences from those facts, reasonably warrant the

intrusion." <u>Terry</u>, 392 U.S. at 21, 88 S. Ct. 1868.
Those facts must tend to show that the detainee has
committed or is about to commit a crime. <u>Gallegos</u>, 114
F.3d at 1028 (citing <u>Florida v. Royer</u>, 460 U.S. 491, 498,
103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). Second, the
officer's actions must be "'reasonably related in scope
to the circumstances which justified the interference in
the first place.'" <u>United States v. Shareef</u>, 100 F.3d
1491, 1500 (10th Cir. 1996) (quoting <u>Terry</u>, 392 U.S. at
20, 88 S. Ct. 1868). At both stages, the reasonableness
of the officer's suspicions is "judged by an objective
standard taking the totality of the circumstances and
information available to the officers into account."
<u>United States v. Lang</u>, 81 F.3d 955, 965 (10th Cir. 1996).

### A.

We agree with the government that the district
court's order impermissibly "evaluate[d] and reject[ed]
each factor in isolation" and failed to accord proper
deference to the judgment of an experienced officer. <u>See
United States v. Gandara-Salinas</u>, 327 F.3d 1127, 1130
(10th Cir. 2003). The district court proceeded through
the factors listed by the government, but evaluated and
rejected each before moving on to the next. The court's
order mentions the appropriate "totality of the
circumstances" standard only once, in passing, and only
after having analyzed each factor cited by Officer
Middleton in isolation. Our de novo review of those
factors leads us to conclude that the totality of the
circumstances Officer Middleton faced made his suspicions
and actions reasonable.

* * *

### 5. The "War Zone"

The only factor the district court found relevant to
the reasonable suspicion analysis was the dangerousness
of the area in which the stop took place. Quoting
<u>Illinois v. Wardlow</u>, 528 U.S. 119, 124, 120 S. Ct. 673,
145 L. Ed. 2d 570 (2000), the district court correctly
acknowledged that the nature of the area in which a
detention takes place is a relevant consideration in the
<u>Terry</u> analysis. The court went on, however, to find the
following statement in Wardlow controlling: "An
individual's presence in an area of expected criminal
activity, standing alone, is not enough to support a
reasonable, particularized suspicion that the person is
committing a crime." 528 U.S. at 124, 120 S. Ct. 673.
Given our discussion above of the numerous factors
erroneously rejected by the district court, this latter
statement obviously does not apply in this case.

6. The Totality of the Circumstances

In ignoring these reasons for Officer Middleton's continuing suspicion, the district court "failed to accord deference to the [officer's] ability to 'draw on (his) own experience and specialized training to make inferences from and deductions about the cumulative information available to (him) that might well elude an untrained person.'" Gandara-Salinas, 327 F.3d at 1130 (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)). All of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by Officer Middleton at the inception of the detention.

Id. 1189, 1193-94.

Reasonable suspicion, however, cannot be based upon an officer's "unparticularized suspicion or hunch." Brown v. Texas, 443 U.S. 47, 52 n.2, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994). The determination of reasonable suspicion also "must be based on common sense judgments and inferences about human behavior." Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (citing United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). It goes without saying, of course, that the officers' testimony regarding the circumstances of the stop must be credible.

III. **Analysis**

The government asserts that the officers had reasonable suspicion to stop and detain defendant based upon the description of the suspect and defendant's proximity to the location of the reported crime. Obviously, the starting place in a "totality of circumstances" analysis is the information upon which the officers acted. There is no dispute that Ms. Montellano gave an accurate

-7-

description of the suspect to the 911 operator.  There is no claim that the dispatch log inaccurately reflects Ms. Montellano's description.  The officers testified that they were looking for a suspect having the description set out in the log and put out over the radio but with one very significant exception: they assert that they were unaware that the suspect was Hispanic.  How could the officers have missed this important part of the suspect's description?  The government has offered no explanation and no "common sense" explanation is apparent from the totality of the circumstances.   This is especially problematic given Officer Schindler's testimony that the person stopped –the defendant– was a white male wearing a grey sweatshirt and blue pants . . . on a bike.  The dispatch log does not describe the suspect as a white male and there is no evidence that the radio call gave such a description.  Moreover, it is uncontested that defendant was not wearing a grey sweatshirt and blue pants.  The stop occurred mid-morning and Officer Schindler was within a few feet of defendant. Yet, her testimony regarding defendant's attire is completely inconsistent with the facts.  The government offered no evidence to explain the inconsistency and the court is not required to speculate regarding what, if any, explanation Officer Schindler might have.  The only reasonable, common sense conclusion which can be drawn from the totality of the circumstances is that Officer Schindler stopped a person whose attire did not match in significant aspects the description given over the radio.   The court finds that a reasonable officer under like circumstances would not have a "particularized and objective basis" for

-8-

suspecting that defendant matched the description of the suspect.

The government also asserts that location played a part in the officers' decision to stop and detain defendant. The evidence was that a number of car burglaries or break-ins had occurred recently in the area where the suspect was reported. This information, viewed in isolation, tends to support the officers' decision. However, in the context of the totality of the circumstances, the importance of location seems, at best, to be secondary to what the officers claim to be the real reason for their decision: the suspect's description. The location of the stop was a city street, and there is no evidence that it was a high crime area. The stop occurred at midmorning and it is reasonable to assume that there were motorists and perhaps pedestrians in the area, yet no one other than defendant was stopped. If location was a significant factor, why hadn't the officers stopped other persons?

According to the officers, defendant was not riding his bicycle in a suspicious manner. There is no evidence that the information broadcasted over the radio said that the suspect was riding a bicycle. Thus, considering the totality of the circumstances, there is no evidence that defendant's mode of transportation supplied reasonable suspicion for the officers' actions.

Therefore, the court rejects the government's contention that the proximity of the stop to the area of the reported crime played any significant role in the totality of circumstances surrounding the stop. "An individual's presence in an area of criminal activity, standing alone, is not enough to support a reasonable

particularized suspicion that the person is committing a crime."
Illinois v. Wardlow, supra, 528 U.S. at 124.

The next step in the "totality of circumstances" analysis is Officer Schindler's "pat down" of defendant.  The second prong of the Terry test requires that the officer's actions must be reasonably related in scope to the circumstances which justified the interference in the first place.  Johnson, 364 F.3d at 1189. The Tenth Circuit has repeatedly stated that "since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a Terry stop."  United States v. Shareef, 100 F.3d 1491, 1502 (10th Cir. 1996).  "Such measures are warranted, however, only if the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate."  Id.  See also United States v. Manjarrez, 348 F.3d 881, 886 (10th Cir. 2003), cert. denied, 541 U.S. 911 (2004) and United States v. Mitchell, 61 Fed. Appx. 616, 618 (10th Cir. 2003) ("But when the officer possesses only reasonable suspicion to detain a person, the officer may constitutionally conduct a warrantless pat-down search of the person only 'where he has reason to believe he is dealing with an armed and dangerous individual.' (citing Terry).")

In this case, no facts support a finding that a reasonable officer would be concerned for her safety nor did Sergeant Schindler testify to any particularized facts that made her concerned for her safety.  The suspect was not described as armed,

-10-

it was daytime and defendant was on a bike.  There is no evidence that any of the earlier break-ins involved weapons or violence. Accordingly, Sergeant Schindler's actions were not based on a particularized and objective basis and were not reasonably related to the totality of the circumstances.  Indeed, under Officer Schindler's practice, every person she stopped whether on foot, riding a bicycle or in a vehicle, would be subjected to a pat-down.

After defendant was patted down, he was detained for approximately twenty minutes before his arrest, allegedly to verify his identity.  There is no evidence that defendant refused to identify himself.  On the contrary, he apparently did so.  Both officers testified that they had no reason to suspect that defendant's answers to their questions were false.  There is no evidence that a person must have identification to ride a bicycle in Deming, New Mexico.  Moreover, Lieutenant Gigante testified that defendant's description of the house he had visited was accurate. In short, during the period of detention, there is no evidence that the officers had any reasonable, articulable suspicion that defendant was involved in criminal activity.

The court does not accept Officer Schindler's testimony that NCIC was used as a means to verify defendant's identity. NCIC may, or may not, be one way to verify a person's identity but its true purpose, as everyone in this business knows, is to check to see if a person has a criminal record or is wanted.  Since the officers accepted as true defendant's statements regarding his identity, the only possible explanation for an NCIC check was to see if there was a reason to arrest defendant for some reason other than breaking

-11-

into a car.

Once defendant's answers dispelled any concerns, the officers should have allowed defendant to leave.  The court rejects the officers' statements that defendant was free to leave.  First, they did not tell defendant he could leave.  Second, common sense militates against any suggestion that defendant felt free to leave. He was standing in the street with two armed officers.  It is true that defendant testified that he was not threatened and that he answered the officers' questions.  However, the record is unclear, at best, what the questions were, beyond those relating to his identity which obviously took place before the 20-minute NCIC check period.

In conclusion, based on the totality of the circumstances, and considering the evidence from the perspective of a reasonable officer with experience and training in procedures relating to a Terry stop, the court finds that the officers did not possess reasonable suspicion to stop defendant at the inception of their contact with him and further that their subsequent actions of patting-down and detaining defendant were not reasonably related in scope to the circumstances that motivated the initial stop.

IV.  The "HM" Notation

Finally, there is the matter of the "HM" notation on the dispatch log.  In order to give the officers the benefit of the doubt, the court will not assume that the "H" description was broadcast over the radio.  Obviously, if the officers' testimony is credited, the suspect was describe as male ("M").  Nonetheless, the court was, and remains, absolutely incredulous that two

-12-

experienced officers would testify that they did not know the meaning of "HM" on the dispatch logs of their very own police department.

As an exhibit to its motion to reopen the hearing, the government has presented an affidavit from Lieutenant Gigante which states, in pertinent part:

> During cross-examination I was asked what the term "H" "M" meant. I answered truthfully that I was unsure as to what the reference was made to. Defense then presented me with a copy of what was a "Luna County Central Dispatch" Radio Log.
>
> Defense asked me to refer to line nine (9) and again answer what the term "H" "M" meant. I answered truthfully once again that I did not know what that term meant. Defense then asked does the term not mean "Hispanic Male"? I answered that I did not know. Upon testifying that I did not know, meant the fact that I could not truthfully testify, under oath, that with the radio log presented in front of me, the specific notes of "H" "M" meant "Hispanic Male", again as I did not write that notation.
>
> During my years of service I have testified in other criminal trials and have been shown radio logs for reference. At no time utilizing those logs have I been asked to interpret a dispatchers notes and to the extent of what abbreviations meant. Also, during my ten year career I have never seen or been made aware of any set standard of abbreviation relating to "Hispanic Male". The most common abbreviations that I have seen are: Hisp; Hsp., or the entire word spelled out. I have never personally testified to the fact that just the initials of "H" "M" mean Hispanic Male. Again, only the person making any given notation can testify to what those notes translate into.
>
> Based upon the way the question was asked I would have been speculating as to what another person's notes meant. I did not write the information on that radio log and prior to this date, had never seen that radio log. I felt as though I was being asked a question that I would have been assuming what notes of another person translated into. There was no way for me to answer without a doubt what the radio log translation meant since I was not the person who Wrote the notes.

> During my ten (10) year career, I spell-out the term "Hispanic" in the completion of official police reports. I use the abbreviation of Hisp. or Hsp. for translation into Hispanic.

Interestingly, no similar affidavit is offered on behalf of Officer Schindler, who initiated the stop based on the same description of the suspect.

The government's explanation of Lieutenant Gigante's testimony and affidavit is:

> During cross examination, Detective Gigante was asked if he knew what "HM" meant. In response, the detective stated that he did not know what "HM" meant in the log. It must be remembered that the detective did not write the log and the first time he saw the log was when it was presented in court. He was being asked to interpret the "shorthand" of a brand-new dispatcher and, truthfully, did not understand what "HM" meant. Also, the testimony of First Sergeant Kathleen Schindler completely corroborates the testimony of Detective Gigante in every regard including not being aware of the meaning of "HM" as it appeared on the log.

> Detective Gigante is a ten-year veteran of the police force with an unblemished record. He has testified in more than 100 criminal proceedings. Never once has his integrity or veracity been in question. (See the affidavit of Lt. Gigante attached as exhibit A). A negative credibility finding of a police officer effectually ends his career as a law enforcement official. The Government, in hindsight, believes it could have cleared up any misunderstanding through redirect examination. However, at the time, the Government did not believe, and still does not believe, that any issue related to the dispatch logs is relevant to the merits of the motion.

The government overlooks the court's role in deciding a motion to suppress. While the court certainly does not want to ruin Lieutenant Gigante's career (and there is no evidence that the court's ruling will), the court is not required to accept, without question, an officer's testimony. The court declines to accept at face value the testimony of an officer with ten years experience

-14-

in New Mexico that he does not know the meaning of the letters HM on the department's dispatch log. (There is no _evidence_, by the way, that the dispatcher was "brand-new.") Lieutenant Gigante's belated attempt to explain his testimony is not persuasive and does not justify reopening the hearing. For similar reasons, the court declines to accept at face value Officer Schindler's testimony regarding the HM notation. Nevertheless, as should be obvious from the preceding analysis, the HM issue is not the reason the court has determined to grant defendant's motion.

The court also does not accept the government's position that the dispatch log entries are irrelevant. _Why_ are they not relevant? The government does not explain and the court will not speculate on an explanation. The logs are clearly relevant to the totality of the circumstances surrounding the officers' decision to stop and detain defendant, as is Ms. Montellano's testimony, which supplied the description of the suspect, thereby setting in motion the entire factual sequence.[1]

## V.  Conclusion

Defendant's motion to suppress is GRANTED. The methamphetamines obtained subsequent to defendant's arrest and any statements made by defendant are suppressed. The government's motion to reopen is DENIED.

IT IS SO ORDERED.

---

[1]The government also objected to Ms. Montellano's testimony as irrelevant, leaving the court to wonder what is the government's definition of relevant evidence. The government is reminded of the definition of relevance in Fed. R. Evid. 104(b) as well as Rule 1101.

Dated this __1st__ day of August 2005, at Wichita, Kansas.

                              s/ Monti Belot
                              Monti L. Belot
                              UNITED STATES DISTRICT JUDGE